FILED
2026 Sep-21 AM 10:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **GREG EASTERLING,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No. 2:24-cv-848-ACA** |
| | } | |
| **CITY OF BIRMINGHAM,** | } | |
| | } | |
| **Defendant.** | } | |

**MEMORANDUM OPINION**

Plaintiff Greg Easterling, a white man, works for Defendant City of Birmingham as a supervisor in the City's equipment management department. In 2022, Mr. Easterling applied for a promotion to become fleet operations superintendent. But the City selected a black man to fill the position. Believing the selection process contained irregularities that showed the black candidate was preselected by department leadership, Mr. Easterling sued. His complaint asserts two claims under Title VII, 42 U.S.C § 2000e *et seq.*: disparate treatment ("Count One") and retaliation ("Count Two").

The City moves for summary judgment on both claims. (Doc. 22). For the reasons below, the court **WILL GRANT** the City's motion and **WILL ENTER SUMMARY JUDGMENT** in its favor on both claims.

## I. BACKGROUND

At the summary judgment stage, the court "view[s] the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve[s] all reasonable doubts about the facts in favor of the non-movant." *Washington v. Howard*, 25 F.4th 891, 897 (11th Cir. 2022) (quotation marks omitted). Where the parties have presented evidence creating a dispute of fact, the court's description of the facts adopts the version most favorable to the nonmovant. *See id.*; *see also Cantu v. City of Dothan*, 974 F.3d 1217, 1222 (11th Cir. 2020) ("The 'facts' at the summary judgment stage are not necessarily the true, historical facts; they may not be what a jury at trial would, or will, determine to be the facts.").

Mr. Easterling, a white man, started working as a vehicle technician in the 1980s. (Doc. 21-1 at 11; doc. 1 ¶ 10; doc. 17 ¶ 10). He joined the City in 2008 as a heavy truck technician in the equipment management department. (Doc. 21-1 at 12, 14). In the equipment management department, technicians reported to supervisors, and supervisors reported to fleet operations superintendents. (Doc. 21-2 at 51–52; doc. 21-4 at 2–5). Above the superintendents, Cedric Roberts, a black man, managed the department as its director, and Caesar Fail, who is also black, was the deputy director. (Doc. 21-2 at 51–52; doc. 21-4 at 2–5; doc. 21-2 at 4, 13).

In 2017, Mr. Roberts promoted Mr. Easterling to supervisor in the City's shop responsible for fire equipment. (Doc. 21-1 at 13; doc. 21-2 at 20). Mr. Fail advocated

for Mr. Easterling to get the position. (Doc. 21-2 at 20–21). Mr. Easterling performed well in the position. (Doc. 21-1 at 28; doc. 21-2 at 50).

In February 2022, Mr. Roberts moved Mr. Easterling to supervisor over the preventative maintenance shop for cars and light trucks. (Doc. 21-1 at 13). Mr. Roberts moved Mr. Easterling because the previous supervisor of the preventative maintenance shop was not performing well, and Mr. Easterling had a good "demeanor" and "customer service mindset." (Doc. 21-2 at 18–19). Mr. Roberts also believed that Mr. Easterling was "undermining" the equipment management department by relaying internal information to the fire department. (*Id.*; doc. 21-6 at 8).

Throughout Mr. Easterling's time with the City, he witnessed or heard about several interactions that made him feel as though Mr. Roberts and Mr. Fail treated black employees more favorably. (*See* doc. 21-1 at 14). For example, during the COVID-19 pandemic, Mr. Fail instructed a white employee to properly wear a face mask but did not make the same remark to a black employee who was not properly wearing a mask. (*Id.* at 15). Second, the duo allowed some black employees to wear clothes other than the standard uniform, while Mr. Fail asked for white employees to be disciplined for the same conduct.[1] (*Id.* at 33, 140). Third, two black supervisors

[1] The City objects to evidence from Mr. Easterling's letter to the EEOC because it is "unauthenticated and unsworn." But Mr. Easterling authenticated the letter in his deposition. (Doc. 21-1 at 38–39). And the evidence within the letter could be presented in admissible form at trial

had service writers—employees who are like secretaries—but no white supervisor had a service writer.[2] (*Id.* at 43). And fourth, most employees in supervisory positions (director, deputy director, superintendent, and supervisors) are black. (*Id.* at doc. 21-1 at 143).

In late 2022, one of the two superintendents retired, and the Personnel Board of Jefferson County posted a job opening for the vacant position. (Doc. 21-3 at 1; doc. 21-1 at 16–18). The Personnel Board created the job description and minimum qualifications for the position. (Doc. 21-9 ¶ 11). Mr. Easterling applied for the position. (Doc. 21-1 at 17–18).

1. Minimum Qualifications

Among other minimum qualifications, the posting required a commercial driver's license ("CDL"). (Doc. 21-3 at 1). Alternatively, a candidate could have a valid driver's license and the ability to obtain a CDL within ninety days of the date of hire. (*Id.*). Mr. Easterling had his CDL, so he met this qualification. (Doc. 21-1 at 8; doc. 21-2 at 10).

---

because Mr. Easterling could testify to the facts asserted. *See Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1015–16 (11th Cir. 1987).

[2] Mr. Easterling also asserts that several white employees left the department because of race discrimination and that Joe Logan, a black employee, was preselected for a position. (Doc. 25 at 9–10 ¶¶ 11, 18). But the only evidence that Mr. Easterling offers is hearsay that cannot be reduced to admissible form because Mr. Easterling does not identify the declarant. (*See* doc. 21-1 at 15, 41); *see Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 962 (11th Cir. 1997) (explaining a court can consider inadmissible hearsay only when it can be reduced to an admissible form at trial).

Around the same time as the job posting, the state of Alabama changed the requirements to obtain a CDL, making it "virtually impossible" to obtain a CDL within ninety days. (Doc. 21-2 at 7; doc. 21-5 at 10). Mr. Roberts informed the City's human resources director, and she asked the Personnel Board to change the length of time to 180 days after hiring. (Doc. 21-2 at 7). The Personnel Board agreed to extend the time, but the job description never reflected the change. (*Id.* at 7–8). Mr. Roberts made the same requests for other positions. (*Id.*; doc. 21-4 at 8).

When Mr. Easterling heard about the extension, he approached Jason Smith. (Doc. 21-1 at 19–20; doc. 21-6 at 9–10). Mr. Smith, a white man, was a superintendent and Mr. Easterling's supervisor. (Doc. 21-6 at 4, 10). Mr. Easterling told Mr. Smith that if the City selected one of the candidates who did not have their CDL over him, Mr. Easterling would file a complaint. (Doc. 21-1 at 19). After this interaction, Mr. Smith voluntarily removed himself from the selection process. (*Id.*).

After reviewing the applications, the Personnel Board created a certified list of eligible candidates and forwarded the list to Mr. Roberts. (Doc. 21-9 ¶¶ 13–14; doc. 21-2 at 7, 54). The only candidates who made the list of qualified applicants but did not have their commercial driver's license were black. (Doc. 21-1 at 20; doc. 21-7 at 10; doc. 21-8 at 7–8). Mr. Roberts could interview only candidates from the list of eligible candidates. (Doc. 21-2 at 54).

2. Structured Interviews

Mr. Roberts and Mr. Fail interviewed candidates using a structured interview process. (*See* doc. 21-2 at 60; doc. 21-9 ¶¶ 18–19). The structured interview process required Mr. Roberts to ask the same predetermined questions in the same order. (Doc. 21-2 at 9; doc. 21-9 ¶¶ 19–23). Training materials recommended that the interviewing panel consist of three to five interviewers and "[c]onsider diversity." (Doc. 21-3 at 25; doc. 21-9 ¶¶ 24–25). The City required interviewers to grade the candidates' answers based on a predetermined scoring guide. (Doc. 21-9 ¶ 19). But within the predetermined benchmarks, interviewers had discretion based on the candidate's answers. (Doc. 21-2 at 21).

During the interviews, Mr. Roberts and Mr. Fail took high-level notes on a score sheet. (Doc. 21-3 at 62–72; *see* doc. 21-3 at 27, 33). The duo used the notes to remind themselves of the candidate's answers when scoring him after the interview concluded. (Doc. 21-2 at 30). The answer sheets listed the predetermined scoring ranges and contained an individual score and a group score. (Doc. 21-3 at 62–72). At the end of the sheet, Mr. Roberts and Mr. Fail tallied the candidate's total score. (*See id.* at 72).

During Mr. Easterling's interview, Mr. Roberts asked Mr. Easterling about his prioritization "in [his] shop." (Doc. 21-1 at 23–24). Mr. Easterling "assumed"

that Mr. Roberts did not ask any other candidate this question, but he never spoke to the other candidates about the questions they received. (*Id.* at 24).

At the conclusion of all interviews, Mr. Steele received fifty-five points for the answers provided in his interview. (*Id.* at 73). Mr. Newsome scored fifty-two points, and Mr. Robinson scored fifty points. (*Id.* at 94–95). Mr. Easterling received forty-nine points, putting him in fourth place. (Doc. 21-3 at 72).

### 3. The Decision

In February 2023, Mr. Roberts informed the applicants that Mr. Steele had received the open superintendent position. (Doc. 21-1 at 27, 140). After the meeting, Mr. Easterling approached Mr. Roberts and expressed his frustration with the decision. (*Id.* at 27). Mr. Roberts told Mr. Easterling that he did not receive the promotion because of his demeanor. (*Id.* at 28). Mr. Easterling responded that he felt like he had been discriminated against because of his race. (*Id.* at 29).

Since Mr. Easterling filed this lawsuit, Mr. Roberts has spoken to Mr. Easterling less and assigned work to individuals that Mr. Easterling supervises. (Doc. 21-1 at 30). Mr. Easterling has never been disciplined; he remains in the same position and has voluntarily elected to not apply for other promotions. (*Id.* at 14, 27).

## II. DISCUSSION

In deciding a motion for summary judgment, the court must determine whether, accepting the evidence in the light most favorable to the non-moving party,

the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[T]here is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Looney v. Moore*, 886 F.3d 1058, 1062 (11th Cir. 2018).

Count One alleges that the City failed to promote Mr. Easterling to superintendent because of his race. (Doc. 1 ¶¶ 70–87). Count Two asserts that the City retaliated against Mr. Easterling by not promoting him after he engaged in activity protected by Title VII. (*Id.* ¶¶ 88–102). The court takes each claim in turn.

1. Count One

The City argues that it is entitled to summary judgment because Mr. Easterling failed to establish (1) pretext under the *McDonnell Douglas* framework, (2) a convincing mosaic of circumstantial evidence that could allow a jury to reasonably infer intentional discrimination, or (3) a mixed-motive theory of retaliation. (Doc. 23 at 16–22, 32–35). Mr. Easterling responds that he can prove his case under any of these three frameworks. (Doc. 25 at 21–29). The court agrees with the City.

Under the *McDonnell Douglas* framework, the plaintiff must first establish the *prima facie* elements of his claim. *Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1336 (11th Cir. 2024). Then the burden shifts to the employer to articulate a "legitimate, non-discriminatory reason" for the adverse action. *Id.* If the employer does so, then the burden shifts back to the plaintiff to show that "there is enough

evidence for a reasonable jury to infer intentional discrimination." *Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1020 (11th Cir. 2023). This final stage of the *McDonnell Douglas* test is identical to the convincing mosaic inquiry. *Id.* Here, the parties do not dispute the first two *prima facie* elements of the *McDonnell Douglas* framework. (*See* doc. 23 at 16–17; doc. 25 at 25–27). Accordingly, the only issue before the court under either framework is whether Mr. Easterling has presented "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Ossmann*, 82 F.4th at 1020. And because Mr. Easterling argues that he succeeds under a mixed-motive or single-motive theory, he can prove this by showing that race "was a 'motivating factor' or the 'true reason' behind" the adverse action. *Vincent v. Jefferson Cnty. Bd. of Educ.*, 152 F.4th 1339, 1347–48 (11th Cir. 2025).

So under any framework, Mr. Easterling must present evidence that "raises a reasonable inference that the employer discriminated." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011); *see also Vincent*, 152 F.4th 1347–48. The court must consider the totality of Mr. Easterling's circumstantial evidence, including but not limited to "(1) suspicious timing or ambiguous statements, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1342 (11th Cir. 2023). Mr. Easterling relies on seven pieces of circumstantial evidence to form his

convincing mosaic. (*See* doc. 25 at 21–27). But as explained below, much of Mr. Easterling's evidence does not carry probative force under the convincing mosaic inquiry. The remaining pieces of evidence provide only little support for Mr. Easterling's mosaic, and even when considered in totality fail to raise a dispute of material fact that his race was the true reason or a motivating factor for why he was not chosen for the promotion.

First, Mr. Easterling presents evidence that Mr. Roberts modified the superintendent's minimum qualifications to allow an applicant 180 days to obtain a CDL, which made two black applicants eligible for the role. (Doc. 25 at 21–22). But Mr. Roberts extended the deadline because the state of Alabama changed its requirements to obtain the license, making it "virtually impossible" to get one within ninety days. (Doc. 21-2 at 7; *see* doc. 21-4 at 8). And Mr. Roberts made the same request for other job openings. (Doc. 21-2 at 7; doc. 21-4 at 8). Mr. Easterling offers no evidence that Mr. Roberts knew that neither Mr. Steele nor Mr. Robinson had their CDL and would apply for the position. (Doc. 21-2 at 56). As a result, Mr. Easterling fails to offer evidence connecting the extension to intentional race discrimination. *See Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310 (11th Cir. 2023) ("[I]nferences in favor of an employee can be based only on evidence—not on speculation.") (quotation marks omitted; alteration accepted).

Second, Mr. Easterling argues that he was more qualified than Mr. Steele because he has more experience. (Doc. 25 at 24–25). Although it is true Mr. Easterling worked as a supervisor for longer than Mr. Steele, a plaintiff cannot prove intentional discrimination by simply showing that "he was better qualified than the [candidate] who received the position he coveted." *See Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation marks omitted). Indeed, Mr. Easterling testified that he was more qualified than *all* candidates, including other white applicants. (Doc. 21-1 at 21, 25). Title VII focuses on *intentional* discrimination and does not allow courts to second guess an employer's decision. *See Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1338 (11th Cir. 2022) (explaining that an employer may promote someone "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason").

Third, Mr. Easterling contends that Mr. Roberts did not follow the structured interview protocol by failing to have the "required" a diverse panel of three-to-five interviewers and excluding Mr. Smith after Mr. Easterling informed Mr. Smith that he would file a complaint if a less qualified individual got the position. (Doc. 25 at 23). But the undisputed evidence establishes that the City only recommended a diverse panel in its training material and had no diversity or panel size requirements. (Doc. 21-9 ¶¶ 24–25). And Mr. Easterling presents no evidence that Mr. Roberts

knew of the encounter with Mr. Smith, nor does he explain how Mr. Smith's withdrawal shows that Mr. Roberts intentionally discriminated against him. So he has not created an inference that "established rules were bent or broken to give [an] applicant an edge in the hiring process." *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 644 (11th Cir. 1998).

Fourth, Mr. Easterling asserts that his answers were "not recorded and scored properly." (Doc. 25 at 24). But Mr. Easterling has no personal knowledge about the answers that Mr. Steele (or any other candidate) provided. (Doc. 21-1 at 24). He bases his assertion on jotted notes that Mr. Roberts and Mr. Fail testified were not exhaustive and only high-level summaries. (Doc. 21-9 ¶ 27; doc. 21-2 at 30–31, 38). For example, Mr. Easterling argues that Mr. Steele should not have received the same number of points based on their employment history and Mr. Steele should not have received points for "filling in" for supervisors. (Doc. 25 at 24–26). However, Mr. Roberts explained that the score was not based solely on the candidate's resume; the interviewers considered how the candidate responded. (Doc. 21-2 at 9, 13–14, 59). And the undisputed evidence also shows that white candidates were given credit for filling in for supervisors. (Doc. 21-3 at 74, 79). Mr. Easterling provides only speculation that his scores were not recorded properly. *See Berry*, 84 F.4th at 1310.

Fifth, Mr. Easterling highlights that leadership in the equipment management department is predominantly black. (Doc. 25 at 22). But evidence of the racial

makeup of leadership generally is "not sufficiently compelling" to give rise to an inference of intentional discrimination—courts generally consider evidence of the position for which the individual applied. *See Terrell v. Sec'y, Dep't of Veterans Affs.*, 98 F.4th 1343, 1352–53 (11th Cir. 2024) (affirming summary judgment when the plaintiff provided evidence of the racial makeup of positions other than the job for which she applied); *see also Smith v. Marcus & Millichap, Inc.*, 991 F.3d 1145, 1159 n.7 (11th Cir. 2021) (explaining that statistics must have a "nexus to the parties"). And the undisputed evidence establishes that at all relevant times a white man held at least one of the two superintendent positions. (*See* doc. 21-1 at 15, 143; doc. 21-2 at 17, 56).

To be sure, Mr. Easterling offers two additional pieces of evidence that do not suffer from these same flaws. Mr. Easterling's sixth piece of evidence is that Mr. Roberts and Mr. Fail treated some black employees more favorably than white employees in the past. (*Id.* at 22–23). Mr. Roberts and Mr. Fail allowed black employees to wear clothing other than their standard uniform but punished white employees who did so. (Doc. 21-1 at 33, 140). During the COVID-19 pandemic, Mr. Fail chastised only white employees who did not properly wear a face mask. (*Id.* at 15). Additionally, only black supervisors had assigned service writers to assist with tasks. (*Id.* at 43).

Mr. Easterling's seventh piece of evidence is that Mr. Roberts provided an ambiguous reason for not hiring Mr. Easterling when Mr. Roberts told him that he did not get the job because of his "demeanor." (Doc. 25 at 24).

The court acknowledges that these final pieces of evidence provide some circumstantial evidence of race discrimination. Even so, the totality of Mr. Easterling's evidence does not satisfy his burden of providing sufficient evidence that would allow a reasonable jury to conclude the City intentionally discriminated against him based on his race. *See McCreight*, 117 F.4th at 1338–39 (finding no convincing mosaic when an employee pointed to the lack of discipline for employees outside her protected class, negative statements about the plaintiff's protected class, and alleged deviation from policies); *cf. Jenkins v. Nell*, 26 F.4th 1243, 1249–51 (11th Cir. 2022) (finding a convincing mosaic when the plaintiff offered evidence of the decisionmaker's racist comments, mistreatment of white employees, an unexplained exodus of white employees, and the termination of white employees for conduct that black employees engaged in without punishment). Thus, Mr. Easterling's proffered evidence does not "strongly suggest[] that the [City's] employment decisions were based on [his] race," *Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1337 (11th Cir. 2024).

2. Count Two

In Count Two, Mr. Easterling alleges that the City retaliated against him for (1) informing Mr. Smith that he would file a complaint if a less qualified individual received the promotion and (2) objecting when Mr. Roberts promoted Mr. Steele. (Doc. 1 ¶¶ 88–102). The City argues that summary judgment is appropriate because Mr. Easterling did not exhaust his administrative remedies and cannot demonstrate a genuine issue of fact for trial under either the *McDonnell Douglas* or convincing mosaic framework. (Doc. 23 at 22–31). The court addresses each argument in turn.

*a. Mr. Easterling exhausted his administrative remedies.*

The City argues that Mr. Easterling failed to exhaust his administrative remedies on his retaliation claim because he did not mention retaliation in his EEOC charge. (Doc. 23 at 22–25). Eleventh Circuit precedent forecloses this argument. *See Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988) ("[I]t is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge."); *see also Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004) (explaining that a retaliation claim not made in an EEOC charge was nevertheless exhausted because the "EEOC investigation of [the plaintiff's] race and sex discrimination complaints leading to her termination would have reasonably uncovered any evidence of retaliation"). Mr. Easterling alleged race discrimination in his EEOC charge, so the EEOC investigation "would have reasonably uncovered any evidence of retaliation." *See*

*Gregory*, 355 F.3d at 1280. Thus, he did not have to check the retaliation box on his EEOC charge.

*b. Mr. Easterling fails to offer sufficient evidence of retaliation.*

The City argues that Mr. Easterling cannot show a *prima facie* case of retaliation under the *McDonnell Douglas* framework because Mr. Easterling provided no evidence (1) he engaged in protected activity or (2) of a causal connection. (Doc. 23 at 25–30). The City also argues that Mr. Easterling cannot show a convincing mosaic of retaliation. (*Id.* at 31). The court agrees.

**i. Mr. Easterling cannot show a *prima facie* case of retaliation.**

To avoid summary judgment under the *McDonnell Douglas* framework, "a plaintiff must establish a prima facie case of retaliation." *Ring v. Boca Ciega Yacht Club, Inc.*, 4 F.4th 1149, 1163 (11th Cir. 2021) (quotation marks omitted). Mr. Easterling must show "(1) that []he engaged in statutorily protected expression; (2) that []he suffered an adverse employment action; and (3) that there is some causal relation between the two events." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007).

Mr. Easterling argues that he engaged in protected activity on four occasions by: (1) telling Mr. Smith he would file a complaint if he did not get the position; (2) alleging discrimination to Mr. Roberts after Mr. Roberts announced that Mr. Steele received the superintendent position; (3) calling human resources after

Mr. Roberts made the announcement; and (4) filing an EEOC charge. (Doc. 25 at 33). The court takes each occasion in turn, beginning with Mr. Easterling telling Mr. Smith he would file a complaint if he did not get the position.

Title VII prohibits employers from retaliating against employees "because [the employee] has opposed any practice made an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-3(a). Although informal complaints can constitute a protected activity, the complaint must oppose unlawful practices or participate in investigations or proceedings. *See id.* The parties disagree whether Mr. Easterling's statement to Mr. Smith falls under the participation or opposition clause. (*Compare* doc. 23 at 27–29, *with* doc. 25 at 30–32). The court does not need to decide because Title VII does not protect Mr. Easterling's conduct under either provision.

Title VII's participation clause protects employees who have "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" 42 U.S.C. 2000e-3(a). Threatening to file a charge of discrimination may be treated as participation if the threat is given as notice of an immediate filing. *See Jefferies v. Harris Cnty. Cmty. Action Ass'n*, 615 F.2d 1025, 1035–36 (5th Cir. 1980).[3] Here, it is undisputed that Mr. Easterling's June 2023 EEOC charge—filed

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

almost four months after his statement to Mr. Smith—was the only charge that he has filed. (Doc. 21-1 at 19–20, 32, 128). He has never otherwise complained of discrimination or participated in any investigation. (Doc. 21-1 at 32). Mr. Easterling's threat to file an EEOC charge is too removed from his actual filing of the charge to constitute a protected action under the participation clause. *Cf. Jefferies*, 615 F.2d at 1035–36.

The opposition clause protects an employee opposing employment practices when "he had a good faith, reasonable belief that the employer *was engaged* in unlawful employment practices." *Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997) (emphasis added). Mr. Easterling must show that he subjectively believed that his employer engaged in unlawful discrimination and that the belief was objectively reasonable. *Id.* Here, no reasonable employee could believe that any unlawful employment practice had occurred because no decision had been made. (Doc. 21-1 at 19–20). Mr. Easterling told Mr. Smith that he would complain *if* he did not receive the position. (*Id.* at 19, 21). And even assuming an employee can oppose future, hypothetical discrimination, Mr. Roberts, the decisionmaker, did not know Mr. Easterling mentioned race in his threat to file an EEOC charge. (Doc. 21-2 at 16–17). So Mr. Easterling's statement to Mr. Smith is not protected activity.

For the three remaining occasions of protected activity, the court will assume that each act qualifies as protected activity because Mr. Easterling cannot demonstrate causation. Mr. Easterling argues that these occasions of protected activity led to the "denial of [the] promotion." (Doc. 25 at 36–37; *see also* doc. 1 ¶ 101). So he must show the "relevant decisionmaker was aware of the protected conduct" and that the protected conduct was not "wholly unrelated" to the denial of the promotion. *See Patterson v. Georgia Pac., LLC*, 38 F.4th 1336, 1351 (11th Cir. 2022) (quotation marks omitted). He cannot.

The remaining instances of protected activity either occurred after the decision or Mr. Easterling provides no evidence that Mr. Roberts was unaware of it. First, Mr. Easterling's allegations of discrimination to Mr. Roberts occurred after Mr. Roberts had selected Mr. Steele for the position. (Doc. 21-1 at 27–28). Mr. Easterling counters that he called human resources after the announcement to contest the decision and that they notified him that the human resources department was the decisionmaker. (Doc. 25 at 36–37). But Mr. Easterling did not dispute that Mr. Roberts was the decisionmaker for the position. (Doc. 23 at 7 ¶ 28; doc. 25 at 4 (not disputing ¶ 28)). Second, Mr. Easterling argues that he called the human resources department to complain. (Doc. 25 at 37). Even assuming Mr. Roberts had not yet decided, Mr. Easterling proffers no evidence that Mr. Roberts knew about his purported human resources call. So either (1) Mr. Roberts had made the decision

before Mr. Easterling called human resources or (2) Mr. Roberts did not know about the human resources call when he made the decision—neither situation shows retaliation. *See Patterson*, 38 F.4th at 1351.

Finally, Mr. Easterling has provided no evidence of any retaliation after his EEOC complaints. Although he contends that Mr. Roberts does not communicate as much and assigns work directly to Mr. Easterling's subordinates, Mr. Easterling's complaint and summary judgment brief limit the allegations of retaliatory conduct to the denial of the promotion. (Doc. 1 ¶¶ 96–98, 101; doc. 25 at 36–37). In any event, these actions do not rise to the level of retaliation. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.").

**ii. Mr. Easterling cannot show a convincing mosaic.**

Mr. Easterling brief does not address the convincing mosaic framework in the context of retaliation. (*See* doc. 25 at 28–38). His retaliation claim under this standard fails for many of the reasons it fails under *McDonnell Douglas*. No reasonable jury could conclude Mr. Roberts retaliated against Mr. Easterling by failing to promote him when (1) Mr. Easterling did not engage in any conduct protected by Title VII before Mr. Roberts made the decision, (2) Mr. Roberts did not know that Mr. Easterling spoke to Mr. Smith or human resources, and

(3) Mr. Easterling's other instances of protected activity happened after Mr. Roberts promoted Mr. Steele. Accordingly, the court **WILL GRANT** the City's motion with respect to Count Two.

## III. CONCLUSION

For the reasons above, the court **WILL GRANT** the City's motion and **WILL ENTER SUMMARY JUDGMENT** in its favor. (Doc. 22).

**DONE** and **ORDERED** this September 21, 2026.

**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE